Good morning, Your Honors. Let me introduce myself. I'm Walter Lack. I practice law in Los Angeles. I've been a lawyer in California for 36 years. I've never been sanctioned by a court. I've never been disciplined, and I am mortified by what happened in this case. I'm shaking, literally, as I speak, and I've never done that in a court of law. I have never concealed a fact from a court in any manner that I was handling. I would never conceal a fact. I've never misrepresented to the court. And I'd like to share with you what my state of mind was in the chronology of events that has me involved in this case. And I will answer any question put to me. There were some very strong questions put to Mr. Baker last week that I wanted to get up and answer, and I'll try to use my 20 minutes as quickly as I can. I may speak more quickly than I normally would, but I know I have short time. I first got involved in this case by invitation from a lawyer in Los Angeles who was working with the Maganian Cathcart firm that actually had already been handling this case. They were consulted about it. They called me, and they said, it's too big for us. Could you please look at it? I and Mr. Girardi went to Nicaragua, and we met the labor organizers that had these people part of the unions that did the banana work. We went to the judiciary system. We were introduced to two or three different judges so we could get some understanding of how their courts worked. We then went to the legislature, and we were told by the speaker of the House that this is the only law in the history of their republic, the 100-year-old republic, that was passed unanimously by the entire assembly. And so we felt very comfortable about the fact that this was the law of their country. The purpose of getting hired in the first place was to do three things. Number one, if they were to obtain a judgment against these multinational corporations, most of them were in the United States, and they wanted to know whether we could handle the enforcement of the judgment. Number two, we had just tried a DBCP case, and very few have been tried in this world in Hawaii, where we knew who the experts were. We knew the medicine, and we knew the science. We were asked to provide our support to them to send doctors down there to testify in the local courts about what this chemical is and how it was invented and what it does to people. And then finally, we were asked to write a story about DBCP that could be used by their lawyers. We did all that. We were also asked to provide a list of the defendants that should be named, and we named Dow Chemical Company, we named Old Food Company, we named Standard Fruit Company as the appropriate parties. Shell Oil was the company we gave for the shell entities, because we had just tried a case against Shell. Shell Oil and Shell Chemical are the identical company. We had the stationery of Shell Chemical, it says, a division of Shell Oil Company. All right. We had nothing to do with the preparation of the complaint in Nicaragua. In fact, it was never given to us. We were now asked to weigh in on it. All we were asked to do was provide our opinion as to what would be appropriate service of process. We did the research to find out that Nicaragua was not a party to the Geneva Convention for the effectuation of service of process abroad. So they asked our legal opinion about what would be adequate procedural due process for giving notice. We said, we think you should follow the protocols of the Geneva Convention, and that is you need to have everything in Spanish, the complaint translated into English, it must go through your embassy, it must be delivered to the Justice Department of the United States, and from there the U.S. Marshal would serve it. We learned that the U.S. Marshal no longer is engaged in service of civil process. They have a private company that does that. We provided the name and address of that company. And that's all we know. We were told later that all of the process was served upon one Dole Center, world headquarters for the Dole Food Company in Westlake Village, California. We were not involved in the service of process. Then later, this case I believe was filed in approximately August of 2002. Under the law 364 that's to remain here, 90 days after service of process, a defendant must appear, and as a condition of appearing, there's a bond that needs to be posted. If a defendant attempts to appear later than 90 days after service of process, the amount of the bond goes up substantially. That's prologue. We got a call from the lawyers in Nicaragua during, we were told, during the middle of the trial. And we were told that a Dr. Hurtado representing the interests of the Dole Fresh Fruit Company was now appearing for Dole. And we said, well, that can't be. You didn't name the Dole Fresh Fruit Company in the complaint. I don't know what the Dole Fresh Fruit Company is, but I'll do the research for you. We immediately went on the website of the Dole Food Company and found out through the SEC filings, through their 10-K that they were filing, that the Dole Fresh Fruit Company wasn't even in existence when this pesticide was used. It had been incorporated in Nevada 10 years after the last pesticide had been used in Nicaragua. So we told the lawyers this is a fraud on the court. They didn't even exist at the time. This is a ruse. And so the lawyer that was handling this made a motion. And a copy of that motion was actually provided to us. And in that motion, Mr. Espinoza, Angel Espinoza, stated that it is because of these reasons that we decided to file complaints against all the companies that were involved in the manufacture, distribution, sale, and application of the DBCP, known as Nemagon. Some of the companies are Dow Chemical, Shell Oil, Standard Fruit and Vegetables, currently known as the Dole Food Company. We never filed a complaint against a company called Dole Fresh Fruit Company. But we did, in fact, file a complaint against Dole Food Company, Inc. This is right out of the court file in Nicaragua. Even if they have similar names, they are two different companies, referring to Dole Fresh and Dole Food. Therefore, Dr. Robert Hurtado's appearance on behalf of Dole Fresh Fruit, a company against which we have not filed any complaint, is completely illegitimate in this action because he cannot come to defend and represent a legal entity against which we never filed any complaints. Now, Judge Bergeon asked a very critical question that Judge Manella asked. How can you get a judgment against someone that wasn't allowed to appear in the proceedings? Well, that motion was granted and Dole Fresh Fruit was dismissed, I believe, on November 26, 2002, in open court. The next day, the very next day, the same Dr. Hurtado came into court and pulled out of his pocket a power of attorney for the Dole Food Company, Inc., and said, you recall yesterday, Your Honor, the $100,000 we filed for Dole Fresh Fruit Company, now we'd like to substitute that $100,000 bond for the Dole Fresh Food Company, which is also my client. And the translations have been wrong and Mr. Espinoza testified twice in declarations and then once under oath that Dr. Hurtado and the Dole Food Company was never, never prevented from appearing in the Nicaraguan proceedings. What the judge told him is, no, I'm not going to allow you to intervene. You must exercise your rights, and it's in the record, you must exercise your rights under Section 8 of Law 364. Well, Section 8 is the section that says if you don't post within 90 days and you want to intervene, you have to post a much higher bond. And when we asked under oath the man who made every decision for Dole, the Executive Vice President and General Counsel, Michael Carter, in his deposition, Mr. Baker asked him, then, sir, why didn't you post the higher bond that the court allowed you to post? And his testimony in the record is, I wasn't about to put another penny into that corrupt legal system. And then when we asked him, how many subsidiaries does the Dole Food Company have with the name Dole in it? His answer was, more than 1,200. So there was, and there still is, confusion about what Dole, who is Dole. Now, the other confusion relates to the Standard Fruit Company, against whom a judgment was obtained. The Standard Fruit Company was the company that bought the pesticide and applied it. The Standard Fruit Company is Dole. The Standard Fruit Company's name was changed to Castle and Cook many years ago when the Dole Food Company acquired it. The Standard Fruit Company is Castle and Cook. Castle and Cook is the largest subsidiary of the Dole Food Company. Okay. Now, if you don't mind my interrupting, you've gone about 10 minutes. As I read the report from Judge Tashima, the special master, he found that you and lawyers in your firm knew that the judgment was not against Dole Food Company and you represented to the contrary to the district court and in the filings to this court. How do you respond to Judge Tashima? Have I accurately understood his report? Yes, Your Honor. Where do I begin? The minute I heard, and the first time I heard that the wrong defendant was named, and I'm going to answer your question directly, I was reading a Wall Street Journal article in January of 2003 after the judgment had been entered. I immediately called the lawyers in Nicaragua indicating we've been receiving reports in the Wall Street Journal, an interview of Mr. Carter saying the wrong defendants were named. There must be an exact match between the defendants who were sued and the defendants against whom you obtained a judgment. All right? He then called me on the phone. He said, there have been some typographical errors made and we're going to correct them, but they were just in my office, Mr. Carter and Mr. Medina, the lead lawyers, senior to Mr. Hurtado, trying to settle the case. Now, I'm sorry to interrupt again, but I think you're telling me that Judge Tashima is wrong and that you did not know and that you did not intentionally misrepresent to the district court or to this court. Are you telling me that? I did not intentionally misrepresent that to the court. So in other words, Judge Tashima's special report, special master's report on this is incorrect in your view? No, Your Honor. The document that was submitted says Dole Food Corporation in numerous places. I readily accept that. And when I started investigating this, I was told corporation and company is the same thing. Now, in the first week this case was pending, we have Mr. Ballesteros appointed by the court in Nicaragua. Mr. Ballesteros is described as a master's of foreign law, foreign languages, and he was appointed as an officer of the court to translate all documentation in the case. All right? Yeah. Now, I'll ask it again. And I'll say it as plainly as I can. Judge Tashima concluded, as I read his report, that you intentionally misrepresented to this district court and to this court. Do you agree with that? I do not agree with that, Your Honor. So Judge Tashima is simply wrong? I don't. This is the mystery of my life. I don't know how the conclusion was reached. You either say he's wrong or he's not wrong. Are you saying that Judge Tashima is wrong in saying that? Yes, I believe he is, Your Honor. Okay. If we're now getting to questions, I listened carefully to what you were saying. And I understand that you thought that something else happened in the Nicaraguan court than what appeared. But this is the part I have a really hard time with. Whatever you thought happened in the Nicaragua court, the judgment itself, which you saw, the judgment, which I think you saw, did you see the judgment at some point? I saw it. I saw it in 2005 for the first time. What I received was this document. I'm not talking about the writ of execution. I'm talking about the judgment. I didn't see it until 2005. I see. But you knew it had the wrong name in it. No, that's what I'm trying to get to. But you're saying you saw in the WSJ that it had the wrong name in it. We saw it at that time. Okay. So, but you didn't actually see the piece of paper, even though there was some meeting in L.A. about it, but you never actually saw the document? No, Your Honor. That never happened. Never happened. There was no meeting in L.A. about it. They didn't come to see me. They didn't come to... I found out that they came to L.A. and they went to the Nicaraguan consulate in Los Angeles to get some certification. But there wasn't a meeting with you and Mr. Girardi about the case? Oh, are you talking about the... when Dole Food Company came? No, I'm talking... I thought there was a meeting with Gutierrez and so on in January of 2000. Yes. May I speak to that, Deb? Yes. After they left Nicaragua, I received a call from Dole Food Company. Mr. Carter, can we sit down with you and Mr. Girardi and talk about the case? Certainly. It came in the end of January. All right. They came to my office. So this was a meeting in Los Angeles? Yes, Your Honor. The best evidence of what happened in that meeting is their own Associate General Counsel's three-page summary of what occurred. And during that meeting, contrary to whatever it was suggested otherwise, they came to try to settle the case. And at that time, Mr. Lack offered to open his files to Dole to review what investigation had been done. Mr. Lack told us that they had done everything necessary to screen their clients. They believe they all have good claims. They're all azoospermic or sterile. And this goes on for three pages. And I would offer it to the court. This is their rendition of what occurred during that meeting. And I was there the entire time. Mr. Girardi left early. I thought there was a meeting, maybe in advance of that meeting, with the gentleman from Nicaragua who was your intermediary, Mr. Gutierrez, at which there was a discussion. This is at least what Judge Tshishima's document says, at which there was a discussion of the problem about the judgment not having the right name in it. No, that wasn't what the discussion was. Mr. Gutierrez came to Los Angeles on a number of occasions. Sometimes he'd meet with us. Sometimes he didn't. And there was a discussion about the general status of what's going on in Nicaragua. Because the Franco case was not the only one that had been filed. It was not the only one that was in the legal process. I think Judge Garzón, maybe you're right. Oh, sorry. That's where I was trying to get you then. Whether you saw the document or not, the document that you submitted as an exhibit, which was the affidavit, which we now know to be an affidavit, but which was represented to be the writ of execution, in English, said that the reason why that Dough Food Corporation, Dough Food Company was not allowed to appear because it was not the company named. It says that in that document that you hadn't attached to your complaint. Is that right? No. May I go to the section I think you're referring to? It's important. Okay. I'm trying to find the specific spot I had it marked this morning on the plane. Okay. The one area I marked was a sentence that read, the plaintiffs then moved this court in each complaint to declare the company's Dough Chemical, Dough Food Company, and Shell Chemical in contempt of court. A clerk affidavit was attached to the court record citing the defendant Dough didn't appear. Therefore, it was determined to be in contempt. Okay. Your Honor, I don't think I'm finding the spot you're referring to. I'm going to have to stop the clock. Just a minute. All right. Dr. Spinak pointed out to me, Dr. Hurtado appeared in his capacity as legal representative for Dough Food Company, stating that the interest of his client could be affected by the complaint, and requesting to be given legal standing which was denied. Is that the provision? Yes. All right. Can I explain what happened? If you look at the... I want you to read me what it says first. Didn't it say that it was denied because he wasn't... Since his client was not one of the companies to, and warning the mentioned attorney to exercise his rights according to the procedure. May I explain... And that's where I have had my biggest problem, because that you undoubtedly knew, that that is what it said, and that should have raised up flags by itself. And I read before the last hearing every document that was filed here, and nowhere in all the time that you were just making representations about what actually happened, or how the names were transposed, or anything like that, was that sentence ever discussed or dealt with. Your Honor, I have a definitive answer for you. Okay. Once and forever. First of all, as we understand the way the records are kept, the judge keeps her own book. I'm sorry, who? The judge keeps her own book of proceedings, and the book is paged and numbered, and there's no event in the life of the case that can be entered out of order. So sequentially, you know exactly what happened in the record of the case when the judge makes her entry. All right. So we went back and we looked at the four lines before that, tell us what that proceeding is that they're being excluded from. But why does that matter? So this is where I have my real problems, because you have to come to an American court and enforce a judgment, and what you can enforce is what's on the piece of paper. And that's what the piece of paper says, right or wrong. You're saying it's wrong, but it says it. No, I'm saying it is correct. It is correct, but it relates to a different proceeding than being excluded from the case. And the answer lies in the event just ahead of it in the record, and I could read that to the court to explain what was going on. Okay. The day before, Judge Benavides issued an order, and it required a court order to appoint a judge in the area where the bananas were being grown to take a special discovery event. And it's described in here in the page before. I'll just read it to the court. This is difficult. Does the court have this before? Because I should read it. It's just that important. The very event before related to the appointment of a special judge in Shenandaga to take evidence. And the evidence was that a translator was appointed to drive out 100 miles from the courthouse. All right. And in the event, the plaintiffs filed a motion to extend the period to present evidence, which was approved. Ordering to receive the witnesses proposed and carry out the vigil inspection of barrels, which contained DBCP with the assistance of the expert translator appointed in the court orders in the municipality of Shenandaga through the corresponding petition. The very next entry is Dr. Hurtado making an appearance, which we just read into the record. Stating that the interests of his client could be affected. Requesting that he'd be given legal standing and was denied. He wanted to participate in this discovery proceeding. That's what it relates to. But from the point of view of an American, this is why I get concerned. In the point of view of an American lawsuit, at a minimum, this had to be explained and dealt with. And it never was. It wasn't mentioned anywhere in your papers. Mentioned is this word. And instead, you just kept repeating over and over again that the judgment said what it said. The affidavit was a representation of a document, which we know now it wasn't. But also, you just never dealt with this. Maybe there was an explanation that would have succeeded, but you obviously had a problem with this and it was never dealt with, ever. It, I agree. The purpose of the appeal was not, Your Honor, to get a $400 million judgment and go collect. The only purpose of this appeal was to find a panel of yourselves to listen to the contradiction of the facts, that we were never given a chance to go down there. We found out in six days more about this case than the entire amount that ever occurred before. And I really thought that an oral argument, this panel, panel just like yourselves, would say, you know, it seems to me there's not a robust enough factual record. We're gonna return it to the district court and have discovery actually allowed to be taken instead of dismissing the case on a motion to dismiss. I really thought that. What was the state of, oh, let me go to one other point. At some point, at a minimum, when the, when we could argue about what point, the point at which Judge Minella said it was a suspect document or the point when your associate came and said he thought there was a problem here with this appeal. But at a minimum, at the point at which this document was found, the actual document was found in discovery. And my understanding is that either you or Mr. Traynor, I don't know which, saw that document and knew what was in it before it was handed over. No, Your Honor. Well, it came in from Nicaragua in a large UPS folder. It didn't go to me. It went to Mr. Topp, who was handling the matter. I never saw it. And I didn't ask to see it. And those are mistakes that were made. I mean, if we knew now what we didn't know then, I can't, I can't tell you where this would have led. But I would have asked Judge Minella to give us more time to develop the record. We asked for an earlier argument. It was some early. But that was all afterwards. This point that I'm talking about was afterwards. Much later, much later. So whether it's that point, but at a minimum, at the point at which the document was actually given to you by, you gave it to Discovery, and they then submitted a document to us asking for judicial notice. At that point, you obviously knew what it said. And you still didn't say. Okay. May I tell you? Because this is what, this is going on in my mind. This is dated in April. What they, what they produced was something that was generated back in January. And we had been told that we've gone back to court, corrected all the typographical errors. And this document is the superseding document. And the first word written in English in this translated document from the court-appointed translator is, it says, the first word is, writ of execution. That's what it says in caps in this. All right. So that leads to my other question. My, and this I don't know the answer to. My understanding is that the, that the entire document has a read-in paragraph which clearly says it's an affidavit that was produced by reading something into the record. And that it wasn't really an official translation. And pretty clearly what it is. Was that in English or was that in Spanish? And you didn't attach that. You only attached something beginning at some later point. And what I'm still not clear about is whether the beginning paragraphs were in English at the time when you got the document. I attached anything that was in English. Because when this came to me, they wanted a collective judgment. All right. And so I couldn't read any of the first 10, 15 pages. And I didn't think any judge in the state court would either. We got a rule of state court. You can't have long paper like this. Okay. So I took it all. I still don't know the answer though to why when the document came to you from Nicaragua and you handed it over in discovery. And it was then given to you in a translated form with all of the introductory language. In this motion notice for judicial notice, you still didn't say to us, oh, we made a mistake. I know because I thought this was the superseding document. It came later in time when it was identified as writ of execution. In their system and in our system, a later file document would take precedence over an earlier one. Let me ask you this. Assuming that we accept the factual finding from the special master that there was intentional misrepresentation, what should be the discipline, if any? Your Honor, I'm not familiar with what's appropriate in these matters. I'm really not. But I sat down with this gentleman here in the courtroom, the prosecutor, and there was some very candid exchange of views on this. And I very reluctantly agreed to what he's recommended. But I did so on the advice of counsel and I'm certainly prepared to live with it. Maybe I could follow up with that question. It seems to me that if I review the agreement that you made with the independent prosecutor, that one of the findings in that agreement is that the relevant facts as established by the report have been established by clear and convincing evidence. It also suggests that having, therefore, established these facts by clear and convincing evidence, that we should proceed upon that finding. So in my view, I then go to, well, these are the relevant facts. Everybody agrees by clear and convincing evidence that they are true. And what do I do? And it's my view that I go to the aggravating and the mitigating factors, which I thought you would be presenting today. And if I go to aggravating and mitigating factors, it seems to me that I have to focus in on, well, if I look at aggravating factors, prior disciplinary offenses would not aggravate this particular case because there are none. Dishonest or selfish motives would. And a pattern of this kind of conduct, I can't find any in the record. Multiple offenses, not there. But the one that is worrying me now, as of today, is refusal to acknowledge the wrongful nature of the conduct. Your Honor, no one's more remorseful than I am. Well, but I don't even, frankly, I don't hear anything you've told me today that there was any wrongful. Conduct. There are more mistakes made. There were things that could have been done and should have been done. What? Translators, for example. I've handled cases from 15 different foreign countries involving 10 different foreign languages. This is the first time in 36 years anything like this even remotely has occurred. We have to hire, I've already done it in two cases, Russia and Portuguese. So the biggest problem is a bad translation? I think everyone agrees this is a terrible translation that we relied upon and should not have, Your Honor. I honestly don't see what the translation had to do with it. The problem is, this was when I was the only person, as you know, who was on both panels. Yes. Began and survived refusals. So my first reaction to when I first got the motion for judicial notice was, all right, well, there seems to be a translation problem. And then I looked at the document and I realized that the words were in English. So what does the translation have to do with it? You mean the names of the defendants? Yes. The names of the, there was lots of translation issues, but not around this. I can't even begin to explain how the words were changed. I know, but all I'm saying, whatever it is, it's not a translation problem. It's some other problem. Well, I read one where he was not allowed to participate in the proceedings, but that wasn't a translation problem either. It may have been an inaccuracy or an overstatement, but it wasn't a translation problem. I mean, no one has told me that that was not what the word said in Spanish. I don't read Spanish, but I don't understand you to be saying that's not what the words in Spanish said. You say in context, it meant something else, but you're not saying it was a translation problem. Well, Judge Smith, to answer your question, there were all kinds of lawyer errors. My worry is that from what I've heard today, rather than something which would mitigate the problem, may aggravate because there's no question that you've had substantial experience in the practice of law. There's no question that you have ability to do things that other firms don't. No question that therefore you are at that level. And if I look at the aggravating factors, I was trying to, if you will, parse through these aggravating factors. One could suggest there's a dishonest or selfish motive. And frankly, based on Judge Tashima's findings, one could easily come there. And I was looking for what was one going to say to acknowledge the wrongful nature. And my worry is that all you've done is argue with Judge Berzon, which I think her, as to what has gone on here. Because I feel, after a view of the record, she's better at stating it than I because she's lived with it all these years. But here she is. She's putting it right out to you. And I don't find any, if you will, remorse about that, but only an argument. I did everything I was supposed to do. And now translation is it. I created the wrong impression then. I really have. No one could be more sorry about what's happened than I am. But there's a question as to what you say happened. Meaning, here we have the report of the special prosecutor to which you agreed. And the special prosecutor, the report to which you agreed, the relevant facts as described have been established by peculiar and convincing evidence. I asked you, do you agree with what Judge Tashima found? And you said no. Just a moment. I'd like to hear the answer from Mr. Lack. So either you agree or you don't agree here. And in this report, you agreed. Now you don't agree. And if the question is, as one of the relevant factors, remorse, if you think you and say you did nothing wrong. Oh, no, I didn't say that. If you think and you did nothing intentionally to mislead the court, which is, I mean, that's the key finding in the special master's report. I'm telling you from the bottom of my heart what my state of mind was. Yeah, I know. And you're saying to me then that this agreement in the special master's and the special prosecutor report, you want to walk away from that. In fact, it was not, in your view, established by clear and convincing evidence. No, Your Honor. I signed it. I know you did. I'm living with it. But you're now denying what it says. No, there's a big difference between somebody negotiating over words and what comes from my heart. So I understand what you're saying is that as an objective proposition, you understand how we could come to that conclusion on the record. But that, from your point of view, it isn't what happened. Telling you what my state of mind. That would be apparent. And I'm not sure that's a contradiction. That's what you're saying. Okay, thank you. I better yield my time. May I, Your Honor? Well, this was a time for you to speak. Your lawyer had a good deal of time to speak. Did your lawyer now wish to speak to us? No, I was going to ask Mr. Trena. Hang on just a minute. Let me consult with my fellow panelists if that's what we had in mind. Do you want to hear from Mr. Baker or not? Do you want to just clarify one thing or do you want to make an argument? No, I just want to clarify one thing. All right. Okay, if you'd step to the podium then, please. Can we sit down? Yeah, yeah, please. Thank you. When we were here on October 2nd and you, I think, Judge Smith asked me about, or maybe it was you, Judge Fletcher,  And I basically asked the panel, to allow my clients to talk to you about their state of mind. And what I was attempting to do was to tell you that I agreed with Professor Little that he could prove by clearing convincing evidence that it was intentional. But my point is that in their heart of hearts and in their minds, I know it wasn't intentional and that's what I thought this proceeding was about. Okay. Thank you. Okay. Mr. Trena, now, obviously, we ran well over the 20 minutes. Why don't we proceed in the same manner? You should be allowed to speak uninterrupted for as long as you like, up to 10 minutes or so, followed by questions. And we won't cut you off in the sense of, you know, as long as this takes, this takes. Thank you, Your Honors. First of all, let me just introduce myself. My name is Paul Trena. I've been a lawyer since 1991. I have been with Engstrom Votes Criminal Act since 1996. I'm happy to be here today because I would like to answer your questions and I certainly will answer them the best that I can. I would like to tell you that I have never intentionally made a misrepresentation to any court. I have never made an intentional misrepresentation in my personal life. That's just not who I am. And I want to let you know that because we supply declarations to this court and I hope you've had an opportunity to look at the character declarations. I think they're important in pointing out not only from our adversaries, family members, other people that we are involved with, type of people that we are, including myself, as well as Mr. Lack. And those are people that are moral, and people that try to always do the right thing, and people that certainly are not perfect. And I am not perfect. I made many mistakes. There's no doubt about it. For the last four years, I think about those mistakes every day. Every day when I drive to work and every day when I come home. And I'll explain those mistakes to you a little bit more. But I'll tell you from the very beginning of when I got this case, what my state of mind was and what I knew. And that is I knew nothing in July of 2003 about the Franco case, DBCP, or anything having to do with Nicaragua until I received the removal papers from Mr. Lack. And around that time, Mr. Gutierrez was also there. I didn't draft a complaint. I didn't attach what I referred to as a translated writ of execution or the writ of execution. During the time that the complaint, when the first complaint was drafted, that was drafted by a person in our firm named Steve Terrell. When I got the removal papers, what I was told at that time, and I reviewed the papers, and I'm going to tell you that when I have reviewed the record at the time, I didn't understand everything. I didn't understand everything that was going on in Nicaragua. And I should have. And I should have taken the time to understand everything that's going on in the file. That's my fault. I'm not sure that I understood everything that was going on in the file all the way up and through past 2005 when this started. And what I mean by that is exactly what was going on down in Nicaragua. And I apologize for that. Because I think as an attorney, that you're supposed to find that out. You're supposed to ask the right questions. And you're supposed to find out what the truth is. Because I believe that this was a search for the truth. And I did believe at the time that I was searching for the truth because I was listening to different people who were telling me things that I believed. And being ignorant of the Nicaraguan law, I certainly was. I had no idea what Special Law 364 was. And that's not an excuse. It's just the truth. When I got the removal papers that came in, there were certain questions that were raised. And the one question that was raised to me was whether Dole Food Company was a judgment debtor or not. That was the question to me. I understood at that point in time and had discussions with people in my group. And the other people had the same thoughts that I did and they were communicating the same information. The judgment did have Dole Food Corp on it. The writ of execution or what I believe was the writ of execution, the document that was given to me and represented that we could enforce here in the United States said Dole Food Company. And I understood that was the fight at the time at the district court level with Judge Vanella and with the defendants. What we did at that point in time was we tried to figure out why there was a distinction and whether Dole Food Company was an actual defendant down there at the time. The only thing that I could think of to do is to find out from the lawyers that were down there, the lawyers that were litigating the case, the lawyers that got the judgment. And the lawyers that got the judgment were Mr. Espinoza. And he was contacted. Let me explain a little bit how the declarations were obtained because I think when I read Judge Tsushima's report, it appears to me in a way that he thinks that they were not obtained properly. And how we obtained those and what I probably should have done is actually had an interpreter that we hired at the time and spoken directly over the phone with Mr. Espinoza and that's not what was done. I was speaking directly with Mr. Gutierrez at the time. And the first declaration that was obtained from Mr. Espinoza was a document that was drafted with the help of Stephen Turrell. And that explained to us some of the reasons why there was a distinction between the court on the judgment and the company on what I refer to as the writ of execution. Now, one of the questions that was here the last time is how could you guys, meaning the lawyers, Mr. Tran and Walter Lack, think that what you had in front of you was a writ of execution that was a testimonial? At the time, that's exactly what the document was described to me as. It was the document at that point in time that we could enforce here in the United States. And these declarants explain to us why the names were changed. Now, I realize one of your honors had asked the question, well, in the document that you're referring to, isn't it true that in a section that it says that, and words to the effect, that Dole Food Company was dismissed from, Dole Food Company was never stated in the complaint. I thought we addressed it. I thought that we talked about it. And the reason that I... Really, just so you know, if you need to address this, you have to, because I read all of the documents and nowhere, nowhere, including in response to the motion for sanctions, was there ever an acknowledgement of those sentences and therefore it was never discussed. Can you tell me where it was discussed? I think I can, Your Honor. I think I can. I am referring to a declaration of Angel Espinoza. It would be the declaration that was attached to the reply. And I'm referring specifically to paragraphs 11, 12, and 13. And let me read them. I understand that Dole Food Company alleges on November 25th, 2002, it was excused by the court because it allegedly was not named in the complaint. The argument misconstrues the ruling in the case. Dole Food Company, Incorporated was not part of the hearing on November 25th, 2002. Thus, the court dismissed them from the proceeding. What this means is because they were not part of the particular hearing, they were dismissed from the proceeding. Thus, to take the ruling and act as though they were actually dismissed from the case altogether misconstrues the proceedings that took place. I thought at the time that that addressed the fact that they were a judgment debtor and a part of the document, which we refer to as the writ of execution. And I have to tell you that the rest of the document, to me, when I was looking at it, and my intent at the time, and my mens rea is that Dole Food Company appeared throughout that document. They appeared all over in that document. So from where I was sitting at the time, I believe that they were true judgment debtor and they weren't dismissed. There was another thing that the reason from where I was sitting in July through August when we were drafting these declarations, that I believe that Dole Food Company was a judgment debtor. And that was because I was told and it was provided in declarations, I believe it was by Mr. Espinoza. He indicates, and this would be the declaration in reply that was filed in conjunction with our reply to the motion for remand. He indicates at the time that Dole Food Company was down in Nicaragua prior to the time that the judgment was entered and after the time that the judgment was entered and negotiating a settlement on this very case, the Franco case. In my mind at the time when I understood that, it seemed to me that it was reasonable to believe that they were a judgment debtor and a part of what I was relying upon as the writ of execution. Let me ask you this. Among other things, the special master's report recounts the declaration provided by Lorena Centeno, if I'm pronouncing that right, which in paragraph 10 in particular is favorable to your client's position. But as the special master reports it, he learned that Ms. Centeno, if that's how I pronounce her name, learned more after this was drafted. She specifically objects to paragraphs 5 and 6. She says, with the documents I have seen, I'm now reading from page 30 of the special master's report. She writes an email, I believe to you, with the documents I have seen, the declaration is inaccurate. If you could get more time to file this declaration, I believe it would be best to review the entire file. And just prior to that, she says, I have not read the judgment and the writ of execution. Did you give her the file to review after this? Did you change the declaration in any respect after she sent you this email? The answer to your question is yes, Your Honor. And in what respect did you give her to read? And in what respect did you change? Okay. With regard to the paragraphs that she told us to take out, they were taken out. With regard to the information that was sent to her, I will tell you this. The information was sent by a lawyer in our firm that was talking directly with her. Her name was Liz Hernandez. And the documents that were sent at the time, I can't tell you exactly what she received because the transmittal letter doesn't set forth what was given to her. So let me make sure I've got this. This is, I think, the day before the declaration is to be filed. She says, I have not read the judgment and writ of execution. Right. And are you saying you don't know whether the writ of judgment and writ of execution were sent to her before her declaration was filed? I'm saying to you, Your Honor, I believe that they were because I think at the top of... Just a minute. How could that be when you say you don't have it, never had them at that point? Oh, we did have the judgment and we had what we call the writ of execution. The judgment was given to us in the removal papers, okay? And the writ of execution... So at that point, you had the actual judgment and you had this document that you thought was the writ of execution. That's correct. I mean, we had the judgment and we had the writ of execution. And I believe that there is an email that I sent back something about, can we personally serve it to her? So my understanding was the day that she signed the declaration, she had that information, what I would call the writ of execution and the judgment. And that's why she signed it. And we took the paragraphs off that were referenced in her email. Now, I don't remember if I actually did it. But if you sent her, you didn't have the writ... So you're saying you did not actually see the judgment until the removal papers, at least you didn't. I didn't see anything until the removal papers. So you didn't see at that point? Yes, there was a judgment then. Are you aware that the complaint says that you have the actual original with a writ of execution in your files? And from the beginning, both you and Mr. Lack have said you never did. Is that, what about that? I am aware that the complaint said that. I don't recall the specific time of when I was aware or that I became aware that the complaint said that. But I have always understood that it says that we, I think it says plaintiff's lawyers had the original writ of execution, or words to that effect. It was always my understanding, and it is a true fact, that the document was with the plaintiff lawyers in Nicaragua. Are they in the papers in the United States? No, they're not, Your Honor. So they weren't the plaintiff's lawyers? No, but I think, Your Honor, when I go back and I read that now, when it says the plaintiff's lawyers, it means to me, and I've been consistent on my testimony on this, and Mr. Lack has been also consistent on this, that that certainly means the Nicaraguan lawyers. And we know that's a true fact because the Nicaraguan lawyers are the ones that gave us that document, the January writ of execution in 2005. Let me ask you this. I'll move on to the Mejia Declaration, paragraph four, which is quoted on page 31 of the special master's report. On page 32, the special master writes, Trena and not Mejia, of course, this is a declaration signed by Mejia. Trena and not Mejia, however, drafted paragraph four, paragraph four previously described by Judge Tashima as containing everything for which you could have hoped. Trena and not Mejia, however, drafted paragraph four, and Trena never spoke with Mejia about the contents of the Mejia Declaration. Is that right? That's what Judge Tashima says. I think that's 100% true, Your Honor. I never spoke with Judge Mejia at the time. I spoke with Walter Gutierrez. I didn't speak with Angel Espinoza. I spoke through Walter Gutierrez who was interpreting. So you draft this, you don't speak to the person for whom you're drafting it, he signs it. That's what happens? No, no, Your Honor. Well, that's what Judge Tashima seems to say. I can tell you how it happens, and I agree with him because literally when you read that, it says that I didn't talk to Judge Mejia. That is 100% true. And is it also true that you drafted paragraph four? Yes, but I did it based upon the fact of information that I was getting from Judge Mejia through Walter Gutierrez. I would have no... That's not unusual with regard to the role of lawyers in drafting. I don't know. You know, Your Honor, I should have done it a different way, I guess. And I apologize for that. I wasn't trying to mislead the court. And when I read that from Judge Tashima, in my mind, I was critical of that. I understand that I've done a lot of things wrong, and I should have done them a lot better, but I was critical of that because it was very hurtful because it made it look like I was creating a fraudulent declaration. And that's... We understand that Judge Mejia had his own reasons for denying that he ever saw this thing, and there's no way we're going to resolve that. So I don't think we're basing anything on that assumption at all. The question I do have is, at what... To me, there are two big holes here. One is that you never... Neither you nor anybody in your firm ever asked to see the actual, original Spanish writ of execution. Right? Even after Judge Minella said this was a suspect document. That's true. That's true, Your Honor. And I can explain just what my mind... Okay. I wish I did. I wish... It seems very clear to me now. It does. And I know that it makes people smile, but at that point in time, I was looking at what I believe was the writ of execution in the document that was operative at the time. And I believe that at the time that that was the document. I thought that Judge Minella was wrong at that time. Certainly looking back... You also had the Spanish part of this document, the one that you were given, right? That's correct. And at the top of it, doesn't it say notario affidavit or something like that? At the top of it, Your Honor, and I have it in front of me, it says testimonial. It says testimonial. And then throughout the document, on the first page, it says ejecutoria in a couple of places. And then as you turn through the document, and when I was turning through the document through the period of the couple of months, and people were telling me what it was, it says writ of execution. And at the end, and it says Dole Food Company all throughout it. And I understand that there's some inconsistencies there. So I guess the ultimate question is, because ultimately our question is, what form of discipline, if any, is appropriate? And we understand, and this is something we haven't talked about before, but it seems important. I mean, in some ways, what discipline we accord is not of great importance, because whether you practice in this court for a year or don't practice in this court for a year is really not going to affect you very much. The real question is how it's going to affect the state bar. Is that right? I mean, I don't know how much you practice in this court, but not all that much. I don't practice that much in this court, Your Honor. But I don't want to ever be in a position where I can't. Right. I mean, that's not something that, I don't think I'm a harm to this court. I don't think I'm a harm to the court. I don't think I'm a harm to the public. But I guess what I'd like to know is, if you were to summarize or characterize what it was you did wrong and whether what you did wrong deserves any discipline, and if so, what? What would you say? That is my question. So be careful. That was the one I was exactly going to ask. That's what I asked your colleague. What was the bad conduct you did? I think the bad conduct, Your Honor, was from the very beginning when you get a file. And that is, rather than figuring everything out in the file, obtaining experts early on, going in and getting continuances, relying on people that end up not being very reliable at the end. This is not just one time that it happened. These are people that are making misrepresentations to us from the very beginning. Those are things I think that a lawyer has a job when he's appearing before the court to find out. I believe that it is our job as lawyers to discover what the truth is. I don't believe that it's trying to fool the court or fool the defendants. I really don't. I didn't do a very good job on that. I didn't do a very good job on marshalling other people on my team to oppose the motions to dismiss. And the reason I'm saying that is because there were things that were brought out during my deposition that I realized that I did wrong. And those motions to dismiss had other issues that were brought up in there that I think were other red flags when I'm sitting here now and when I was sitting there during my deposition. And I think when you take a look at the totality of what's going on and then the decision, that all had to do with the motion for remand. And those were the things that go down at the motion for remand. But I think the other thing that I did wrong to be very specific with the court is that when you get an order from the district court judge, I think there's a real failure at that point in time in our firm and on my part to really analyze that order, what it means. And that one of the biggest problems I think in this case is that when we received that order, there was nothing done by myself to go on investigating those facts. I didn't do anything. I didn't do one thing. I didn't go back down. I didn't call anybody from Nicaragua. I didn't call Mr. Gutierrez. I didn't investigate anything that Judge Monella had said. I just automatically took it that she was wrong. And then what we did is we filed the appeal. So the next thing that I think that we did was wrong during that period of time, I don't think it's only an investigation about whether you should file the appeal or not. I think that there is a duty upon a lawyer to investigate during the entire time that the appeal is pending. There were different issues that were raised in what I'm gonna call Franco II, that another case was filed. What I did wrong on that is I think I didn't supervise Mr. Tom. I didn't have an understanding of the discovery that was coming in or the potential impact of that discovery and what the defendants were asking for during that particular proceeding. I didn't have an appreciation for that. I didn't have an appreciation for the time that we filed the motion for protective order with regard to the discovery in the Shell case. I didn't have an appreciation that what it would look like later on is that we were trying to conceal a document from the court which was a central document in this case. It's a failure as far as a lawyer and negligence on my part to be aware of every aspect of a case that is going on. And that was my job. That's why Walter Lank gave me the file. That was my responsibility. And I'm not gonna stand up here and I'm not gonna tell you I was too busy. Whether I was or wasn't, I don't think that's a good excuse. But I will stand up here and tell you that it's my fault. It's my responsibility and I understand that. With regard to discipline, I don't know. And the reason I'm saying that is because I haven't, I'll be honest with you, I have not reviewed the ADA rules and the type of discipline that goes with the conduct that has been outlined either by Judge Tsushima or by Professor Little. I haven't looked at that. I will tell you when you ask Mr. Lack the question, well gee whiz, you agreed to the intentional language that was in the report. I can tell you that from my perspective, it's not that I don't feel bad or not that I don't feel sorry and not that I don't think I did anything wrong. But I don't think I made intentional misrepresentations. That's not me. And so when I agreed to that, that was part of the disposition of the case as far as a settlement. And I think one of your honors explained it pretty well and I think that Mr. Baker explained it. That just was not my state of mind at the time. I will agree with you. Well, what the ADA model rules say specifically is that if there is dishonesty, fraud, deceit or misrepresentation and from what I understand you're saying whether or not there was dishonesty, fraud, deceit, there was at least misrepresentation. I agree with that. And it says that suspension is generally appropriate when a lawyer knows that false statements or documents are being submitted to the court or that material information is improperly being withheld. And then it says reprimand is generally appropriate when a lawyer is negligent either in determining whether statements or documents are false or taking remedial action when material information is being withheld. Now, at least the second must be true. Is that right? And just so I'm clear, so we're talking... Reprimand is generally appropriate when a lawyer is negligent either in determining whether statements or documents are false. And you don't really have to answer this. I'll answer the question. Or in taking remedial action when material information is being withheld. But it seems to me that, you know, you can back it up as far as you want. But even starting at the point that the notice for... the request for judicial notice was made, there was still no remedial action taken. Even at that point. I'll answer your question very specifically. I 100% agree with you. I would agree that a reprimand is appropriate. I would agree that... So then the question is really the next one, which is suspension. Because our problem, to be specific, is that the suggested agreement with the prosecutor was essentially not a... something in between a reprimand and a suspension, right? That's what your question is. I understood it as probation for six months for me with a list of things that our firm has already incorporated some of them. And with regard to an audit, although we don't know exactly what the audit is going to look like, I have a pretty good idea of what it's going to entail or what I would want it to entail. As far as my scope of work and the people that are working under me. So I'm not sure I answered your question. So the question, let's take everything out up until the point. I mean, as you said, you knew that the district court was saying it was a suspect document, but you didn't inquire then. But at a minimum, at the point at which the actual writ of execution was found, translated and sent to you in the motion for judicial notice, then why isn't that within two, i.e. that knows that false statements or documents are being submitted to the court or that material information is improperly being withheld at that point? Okay. I can tell you what I was thinking at that time. I can tell you what I should have done is gone in and corrected the record, indicating that, I'm going to call it the April... was not a true and correct copy of the January writ of execution. I should have done that. I didn't even think about that. What I did think about... Again, as the person who was sitting there reading those documents and scratching my head and saying, what do we do with this? And putting a lot of work into trying to figure that out, which is why you have... What you produce when you're not forthcoming. Why isn't that exactly the kind of thing that this problem is supposed to capture? I think at that point in time... And I'll just tell you what I was thinking. My thought at that point in time is that we had... Mr. Lack said a document later in time. I did not think that all of the declarations and things that people were telling me were somehow negated by that document or that the document that we had on April, what is the testimonial, was somehow a fraudulent document at that point. I didn't think that. Now, I didn't think to go back and correct the record and say, Your Honors, I made a mistake as far as this is not a true and accurate translation because my thought at that point in time is that I had the document that superseded the January writ and that we had the right parties in the lawsuit. So that was my state of mind at the time. That's what I believed and that was wrong. I thought that... Was the writ in January or was the judgment in January? From what I recall, the judgment was in December. There was a January writ and then the April, what we referred to throughout as the writ of execution for the testimonial was in April 2003. So at that point in time in 2005, Your Honor, I was looking at the document that I had and I was wrong on that. I was wrong. Let me ask you, I guess your time is gone, but what do I suggest about timely good faith effort to make restitution or rectify the consequences? Do you think that I can suggest in my findings that that happened? I'm not sure what that means. Well, in this particular matter, if in fact the conduct that Judge Kashima can find by clear and convincing evidence really happened, what did one do to make a good faith effort to make the restitution or rectify the problem? I think, Your Honor, that answers the question this way. That is when at the point in time that we received the January writ, certainly, and I'm going to say it was approximately when we found out about it and until the appeal was dismissed. There's a period of time there where we didn't do anything about it and actually opposed its introduction, which I know. But I will say that what I think what we did was we dismissed the appeal. What we should have done at that point in time and what I didn't know is that we should have went back and we should have corrected the record from that time forward. But didn't the district court opinion in it quote in English the translation of the Spanish beginning of this document, the part that says affidavit and I'm not sure this is so because I can't find it, but this is my recollection, from which you could tell what this was. Isn't that in the district court opinion and isn't that why she said it was suspect? I don't remember. I just don't remember, Your Honor. I do remember that she said that. Unfortunately, I do not have it directly in front of me, but that was my understanding. I do remember that she said. I get that and that's one reason I have such a hard time with all this because she not only said it was suspect, she said why it was suspect. That's my recollection and nonetheless, nobody went back. So you're saying that you thought that this document superseded the other one seems to be a problem in terms of what was in the district court opinion. I thought that this document was the enforceable document here in the United States. That's what I thought it was and that was when we filed the opposition to the motion to supplement. That was what I was thinking at the time. Now, with regard to Judge Minnella's comments that it was suspect, I've already indicated to the court other than obtaining the declarations, I didn't do anything and I should have. But at that point in time, we believed that we had a valid appeal at the time. We believe there was a question of fact at that time whether Dole Food Company was a judgment debtor and a part of what we refer to as the writ of execution. I thought there was a question of fact that was at the district court at that point in time. Should I have researched it more? I should have. I should have. Should I have done all the things that I've told the court? I should have and I didn't. Is the record still complete as to your disciplinary record, prior disciplinary record to this proceeding? I have no... The answer to the question I think is yes, Your Honor, if I understand it. I have never been disciplined by any court in my 19 years of practice. And one could not really suggest that you were inexperienced in the practice of law, could we? I think the answer to your question is no, Your Honor. I'm not inexperienced in the practice of law, but I will say this. In a plaintiff's practice, what is so much different, and this is not an excuse, but when you're a nine or 10-year lawyer in a defense firm that's working in a particular area, you've got that area down pat. In a plaintiff's firm, you don't unless you're working on product liability cases all the time. In our firm, it's not like that. I've never had a DBCP case during my entire practice, and I didn't know what that was. You have a lot of different types of cases coming in. Am I an experienced litigator? I think the answer to the question is yes. Am I familiar with all the facets of law that plaintiff's lawyers do that come into our office? No. So I've now found what the district court said. She said, in her opinion, they did not attach the judgment. They attached a translated version of the writ of execution. The attached document appears to be an affidavit signed on August 25th, 2003 by so-and-so, an attorney and notary public, after requesting the presence of plaintiff's lead Nicaraguan attorney. The notary's signature is certified as authentic by the clerk of the Nicaraguan Supreme Court, followed by the statement, neither the undersigned clerk nor the Supreme Court is responsible for the contents of the document. And so she identified at that point, and I assume in the record at that point, was an English translation of the Spanish part of your document. So my question is, how can you, having seen that then, how was it that later, that either then or later, you thought that your document superseded the early one? In other words, my understanding is that you've been saying, well, I didn't read the Spanish part of this document. I only read the English part, and it appeared to be the writ of execution. But she had in her document, in her opinion, the translation of the preamble of the Spanish part. I understand that, Your Honor. What I was told about this document, what I was told about what is identified there as a notary is that this was the writ of execution. This was the document that we, that was going to be used to enforce the judgment. Okay, but you get an order from a district court saying that it doesn't say that, it says something else, and that she thinks it's a suspect document. And then what? Then you just say, well, I still think what I thought. I'm not even going to look into it. That's the part that bothers me. I'm not going to do anything to look into it. And Your Honor, the answer to your question is, we filed an appeal at that time. I know that's not an answer now, five or six years later, that sets well with the court. But at that point in time, we thought those were some of the factual issues that we wanted this court to take a look at at the time. We thought the idea that it was a suspect document was as a result of the different declarations that were coming back and the arguments that were made. And that was a factual argument that was made before the district court. We thought it was a factual issue that meant that from where we were sitting, Judge Miller didn't have jurisdiction to decide the issue. We thought our motion for remand at that time should have been granted. That's what we were looking at. The idea from our standpoint that it was a suspect document was exactly the factual issue. I guess what I'm asking is your explanation as to why at the end, when you got the actual writ, you said, but my document supersedes it. And you said, because it said on it, writ of execution. You at that point had information from the district court opinion and record, if nowhere else, that demonstrated at least a great question as to that belief. And I believe at that point in time, we should have went back and corrected the record. I agree wholeheartedly with that, Your Honor. But at that point in time, when I was looking at two years later, looking at the document and what I believe that the document was and that it was enforceable and that's what we were to look at, it seemed to me that that was the document that you would look at and that there was still, a factual question at that time. I believe that Zoll Food Company at that time was a proper defendant. And if there's any doubt about that, there were people in my firm that I was working with at the time and that I was there through 2003 through 2005. And I submitted declarations from them for a particular purpose because they knew what I believed because they believed the same thing. And they had worked on the file with me. I have one last slightly word question. Somewhere in all this paper, there was some document, some statement that said something about Walter Gutierrez. You didn't, somebody didn't know about Walter Gutierrez's felony record. Did he have a felony record? Does it turn out that he in fact had a felony record? The answer to your question is, Your Honor, I believe that's true. If you would like me to answer any further about when I found out, I would say within the last year or two. That was not something that I was aware of. Uh, at any time, any time during the district court proceedings, the appeal and most of the OSC. But I did hear that later on. I will tell the court that. I have no further questions. Thank you very much. Thank both of you for coming in. The proceeding in Ray Girardi for this morning is now finished and we are on adjournment. Thank you. All right.
judges: Fletcher W. , Berzon, Smith M.